# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

## No. 93-1709
_____

### UNITED STATES OF AMERICA,

Plaintiff-Appellee,

### versus

### PAUL DOUGLAS TANNEHILL,

Defendant-Appellant.

_____

### Appeal from the United States District Court
### for the Northern District of Texas
_____

### (March 29, 1995)

Before SMITH, BARKSDALE, and PARKER, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

As the last of seven defendants in the early 1980s savings and loan "I-30 scandal" in Texas, Paul Douglas Tannehill appeals his convictions for conspiracy and overvaluation of land, with the critical issue being whether his statutory or constitutional rights to a speedy trial were violated; especially, whether, if only argument, and not testimony or other evidence, is presented on a pretrial motion not heard until after trial begins, the period between filing and argument is excludable under § 3161(h)(1)(F) of the Speedy Trial Act (excludes "[a]ny period of delay resulting from ... any pretrial motion, from ... filing ... through ... hearing").  (Emphasis added.)  Tannehill contends also that the evidence is insufficient, and that the district court erred in

several evidentiary rulings and in refusing a jury instruction. We **AFFIRM**.

I.

In October 1987, Tannehill, a real estate appraiser, was indicted with David Lamar Faulkner, Spencer H. Blain, Jr., James L. Toler, Arthur Formann, Kenneth Earl Cansler, and Paul Arlin Jensen, as a result of their involvement in a scheme in which fraudulent real estate loans were obtained for the purchase of land and the construction of condominiums along Interstate 30 between Dallas and Fort Worth. *See United States v. Faulkner*, 17 F.3d 745, 756 n.9 (5th Cir.), *cert. denied*, ___ U.S. ___, 115 S. Ct. 193, 663 (1994). The 88-count indictment charged that Faulkner and Toler, real estate developers, and their employee, Cansler, arranged for Blain and Jensen, who controlled federally-insured savings and loan associations, to make loans for the purchase of building sites and completed condominium developments at inflated prices, and charged that Tannehill and Formann, a real estate appraiser employed by Tannehill, furthered the scheme by supplying intentionally inflated appraisals.[1] Tannehill was charged in 13 counts with conspiracy, overvaluation of land, wire fraud, and aiding and abetting the misapplication of funds.

All seven defendants were tried in Lubbock beginning in early 1989, but a mistrial was declared that September, after the jury

_____

[1]     Further details about the scheme are provided in our court's two published opinions affirming the convictions resulting from the two trials in addition to Tannehill's. *See United States v. Faulkner*, 17 F.3d 745 (5th Cir. 1994); *United States v. Jensen*, 41 F.3d 946 (5th Cir. 1994).

was unable to reach a verdict. A second trial began in Dallas in June 1991, but pretrial publicity made it impossible to select a jury in Dallas. The district court severed Faulkner, Toler, Blain, and Formann from Tannehill and the other two defendants, and transferred their four cases to the Western District of Texas (Midland). Their trial began in September 1991, and all were convicted that November. *See* **Faulkner**, 17 F.3d at 754-55.

After the Midland trial, Cansler pleaded guilty, and Jensen and Tannehill were severed, at their requests. Jensen was tried and convicted in October 1992. *See* **United States v. Jensen**, 41 F.3d 946 (5th Cir. 1994). Tried in April 1993, Tannehill was acquitted on the wire fraud and misapplication counts and one overvaluation count, but was convicted for conspiracy and the other eight overvaluation counts.[2] He was sentenced, *inter alia*, to six

---

[2] Tannehill was convicted on the following counts: count 1 charged that, between January 1, 1982, and January 9, 1984, Tannehill and six others conspired to misapply funds of federally-insured institutions, to unlawfully participate in transactions and loans of federally-insured institutions, to commit wire fraud, to overvalue land for the purpose of influencing federally-insured institutions, to transport in interstate commerce money taken by fraud, and to defraud the United States, in violation of 18 U.S.C. § 371; counts 2-4 charged that the seven defendants aided and abetted each other in knowingly and willfully overvaluing land to influence the actions of a federally-insured financial institution by fabricating, executing and submitting spurious appraisals on three tracts of land, in violation of 18 U.S.C. §§ 1014 and 2; and counts 5, 6, 11, 19, and 20 charged Tannehill and Formann with violations of 18 U.S.C. §§ 1014 and 2, for submitting false appraisals for five tracts of land.

Tannehill was acquitted on counts 9 and 10, which charged all seven defendants with wire fraud in connection with the transfer of funds in connection with a development; count 12, which charged that he and Formann aided and abetted Blain in the misapplication of funds in connection with a development; and count 13, which charged that he and Formann aided and abetted each other in the

years imprisonment and fined $30,000.

## II.

Tannehill contends that the indictment should have been dismissed for violations of his speedy trial rights; that the evidence is insufficient to sustain his convictions; and that the district court erred by permitting the Government to base its case on summary evidence, by admitting prior trial testimony of a deceased Government witness, and by refusing his requested instruction on reliance on the advice of counsel.

## A.

The district court denied Tannehill's motion to dismiss the indictment for violations of his rights to a speedy trial under both the Speedy Trial Act and the Constitution. We turn first to the statutory claim.

## 1.

"We review the facts supporting a Speedy Trial Act ruling using the clearly erroneous standard and the legal conclusions de novo." *United States v. Bermea*, 30 F.3d 1539, 1566 (5th Cir. 1994), *cert. denied*, ___ U.S. ___, 115 S. Ct. 1113 (1995). Although more than five and one-half years elapsed between indictment in October 1987 and trial in April 1993, Tannehill's statutory claim focuses only on the period between September 4,

---

submission of a false appraisal for that same development.

- 4 -

1992 (filing of several pretrial motions by Tannehill), and the April 1993 trial.[3] Accordingly, in reviewing his statutory claim, we do not consider any delays prior to then.

"The Speedy Trial Act[, 18 U.S.C. § 3161-3174,] requires that a federal criminal defendant be tried within seventy days of his indictment or appearance in front of a judicial officer, whichever comes later. If the defendant is not brought to trial within this statutory period, the indictment must be dismissed." **United States v. Williams**, 12 F.3d 452, 459 (5th Cir. 1994).

However, "[t]he Act provides for a number of `exclusions' in which time that passes is not charged against the 70-day clock." **Id**. One of those provisions, § 3161(h)(1)(F), excludes "[a]ny period of delay resulting from other proceedings concerning the defendant, including but not limited to ... delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion". 18 U.S.C. § 3161(h)(1)(F) (emphasis added).

---

[3] At oral argument, Tannehill's counsel stated that the focus of his Speedy Trial Act claim was on the period after June 1991. But, his briefs and arguments focus only on post-September 4, 1992. The district court found that the period between the June 1991 mistrial and the receipt in September 1992 of the transcript of the severed co-defendants' trial was excludable under 18 U.S.C. § 3161(h)(8). *See* note 5, *infra*.

For motions that "require" a hearing,[4] subsection (F) "excludes the time between the filing of the motion and the hearing on that motion, even if a delay between the motion and the hearing is unreasonable". *United States v. Johnson*, 29 F.3d 940, 942-43 (5th Cir. 1994). Also excluded is the "time after a hearing needed to allow the trial court to assemble all papers reasonably necessary to dispose of the motion, *e.g.*, the submission of post-hearing briefs". *Id*. And, after the court has received all of the submissions, the motion is considered to have been taken "under advisement", and the speedy trial clock is tolled for 30 days, pursuant to subsection (J), which provides for the exclusion of "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court". 18 U.S.C. § 3161(h)(1)(J).

If a motion does not require a hearing, subsection (J) provides for the exclusion of 30 days after the court receives all submissions from counsel regarding the motion. *Johnson*, 29 F.3d at 943. "If the court has several motions on which it must rule, however, this time period can be reasonably extended." *Williams*, 12 F.3d at 460.

---

[4] *See* *Henderson v. United States*, 476 U.S. 321, 329 (1986); *United States v. Johnson*, 29 F.3d 940, 942-43 (5th Cir. 1994); and *Bermea*, 30 F.3d at 1567, for use of the word "required". Because Tannehill requested a hearing, as discussed *infra*, and because, in any event, it is undisputed that at least one or more of the motions at issue "required" a hearing, we need not address what causes a hearing to be "required".

In May 1992, the district court set Tannehill's trial on its October 1992 docket. On September 4, however, Tannehill filed numerous pretrial motions, including a motion to dismiss for violations of the Speedy Trial Act, as well as a motion for a hearing on all pretrial motions. The Government's response, and Tannehill's reply, were submitted by the end of September. On November 20, the district court, *sua sponte*, reset the trial for its February 1993 docket. Tannehill filed additional motions on January 19 and 22, 1993, including a motion *in limine*. On January 29, the district court reset trial for April 5, 1993.

No hearing was conducted on Tannehill's motions prior to trial. After the jury was sworn, the court heard arguments on some of Tannehill's motions, including the motion to dismiss for violation of the Speedy Trial Act, filed in September 1992, and the motion *in limine*, filed in January 1993.

One basis for disposing of Tannehill's Speedy Trial Act claim turns on whether the arguments on his pretrial motions, heard after the jury was sworn, constitute a "hearing" within the meaning of § 3161(h)(1)(F).[5] Although our court has held that the speedy trial

---

[5]    The district court ruled that the delay was excludable under § 3161(h)(8), which provides for the exclusion of "[a]ny period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial".  18 U.S.C. § 3161(h)(8)(A).  Subsection (B) of § 3161(h)(8) sets forth several factors for the district court to consider in determining whether to grant an "ends of justice" continuance pursuant to subsection (A).  Among those factors is "[w]hether the case is so unusual or so complex, due to the number of defendants, the nature of the

- 7 -

clock is tolled for the period between the filing of a motion and a hearing on that motion, even if the hearing is not conducted until trial, those cases do not address the meaning of "hearing" under § 3161(h)(1)(F). *See*, *e.g.*, **Bermea**, 30 F.3d at 1568 ("pending motions carried for hearing just before or during trial will toll the speedy trial clock indefinitely"); **United States v. Santoyo**, 890 F.2d 726, 728 (5th Cir. 1989) (time between filing of pretrial motion *in limine* and hearing on motion at trial excludable), *cert. denied*, 495 U.S. 959 (1990).

The Act does not define what constitutes a "hearing", and the parties have not cited, nor have we found, any authorities addressing the issue.[6] In other contexts, "hearing" has been defined in various ways. *See, e.g.*, **Buxton v. Lynaugh**, 879 F.2d 140, 144-45 (5th Cir. 1989) ("hearing", as used in habeas corpus statute, 28 U.S.C. § 2254(d), "does not necessarily require an evidentiary hearing and ... factfinding based on a record can in some circumstances be adequate"), *cert. denied*, 497 U.S. 1031 (1990); **State v. Orris**, 26 Ohio App. 2d 87, 269 N.E.2d 623, 624 (1971) (the term "hearing" suggests "to `give audience to'");

prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section". 18 U.S.C. § 3161(h)(8)(B)(ii). Because we conclude that the delay was excludable under § 3161(h)(1)(F), we need not address whether the delay was excludable also under § 3161(h)(8).

[6] **United States v. Gonzales**, 897 F.2d 1312, 1315 (5th Cir. 1990), *cert. denied*, 498 U.S. 1029 (1991), seems to imply that "oral arguments" on the defendant's motion to dismiss for lack of a speedy trial, conducted on the day trial began, constitute a "hearing" within the meaning of subsection (F).

*Black's Law Dictionary* 721 (6th ed. 1990) (defining "hearing" as "[a] proceeding of relative formality (though generally less formal than a trial), generally public, with definite issues of fact or law to be tried, in which witnesses are heard and evidence presented").

In determining what Congress meant by its use of the word "hearing" in subsection (F), we must consider the context in which the word is used and give to the term its ordinary meaning within that context. *See, e.g., **Ardestani v. I.N.S.**,* ___ U.S. ___, 112 S. Ct. 515, 519 (1991) (when word used in statute has many dictionary definitions, it "must draw its meaning from its context"); ***John Doe Agency v. John Doe Corp.**,* 493 U.S. 146, 153-56 (1989) (looking to "ordinary meaning" and purpose of statute in interpreting statutory term). Subsection (F) deals with the exclusion of "*any*" delays, caused by the pendency of pretrial motions, from the time limitations imposed by the Act; applies to "*any* pretrial motion"; and excludes, *inter alia*, the period between filing and hearing. (Emphasis added.) Some motions require the presentation of testimony or other evidence (for example, a motion to suppress); others do not (for example, Tannehill's motion *in limine*). In light of Congress' intent that subsection (F) apply to *any* pretrial motion, it would be unreasonable to conclude that the presentation of testimony or other evidence is an essential prerequisite for a "hearing" on a motion within the meaning of that subsection.

We need not determine the precise parameters for a "hearing" under subsection (F), because it is clear that the term includes a

situation in which the district court hears argument of counsel and considers it prior to making its ruling, as was done in this case. Therefore, the entire period between September 4, 1992 (the date on which Tannehill filed his pretrial motions) and the hearing conducted at trial is excludable under subsection (F).[7]  *See* ***Bermea***, 30 F.3d at 1568 (speedy trial clock tolled by motions which were ultimately heard and ruled upon during trial); ***United States v. Gonzales***, 897 F.2d 1312, 1314-16 (5th Cir. 1990) (period following filing of motion to dismiss for speedy trial violation, decided after oral argument on the first day of trial, excludable under § 3161(h)(1)(F)), *cert. denied*, 498 U.S. 1029 (1991); ***Santoyo***, 890 F.2d at 728 (period following filing of pretrial motion *in limine* excludable under § 3161(h)(1)(F) even though motion was carried for hearing during trial); ***United States v. Riley***, 991 F.2d 120, 123-24 (4th Cir.) (although resolution of pretrial motion to suppress was not concluded until trial, entire period between its filing and its resolution was excludable under § 3161(h)(1)(F)), *cert. denied*, ___ U.S. ___, 114 S. Ct. 392 (1993).

---

[7]    The Supreme Court has stated that Congress intended to exclude all time between the filing of a motion and the conclusion of the hearing on that motion, regardless of whether a delay in holding that hearing is "reasonably necessary".  ***Henderson v. United States***, 476 U.S. at 330.  Our court has noted that "[a]n exception might be justified in a particularly egregious case, for example, when defendants have presented repeated unsuccessful requests for hearings or ... other credible indication that a hearing had been deliberately refused with intent to evade the sanctions of the Act".  ***United States v. Walker***, 960 F.2d 409, 413 (5th Cir.) (internal quotation marks and citation omitted), *cert. denied*, ___ U.S. ___, 113 S. Ct. 443 (1992).  Tannehill does not claim such an exception.

2.

Alternatively, Tannehill claims violation of the Sixth Amendment's guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy ... trial". U.S. Const. amend. VI. "In resolving a constitutional speedy-trial claim, we must examine: (1) the length of the delay, (2) the reason for the delay, (3) when the defendant asserted his speedy trial rights, and (4) any prejudice to the defendant resulting from the delay." *United States v. Neal*, 27 F.3d 1035, 1042 (5th Cir.) (citing *Barker v. Wingo*, 407 U.S. 514 (1972)), *cert. denied*, ___ U.S. ___, 115 S. Ct. 530 (1994), and *cert. denied*, ___ U.S. ___, 115 S. Ct. 1165 (1995).

The Government concedes, as it must, that the delay was "extraordinarily long", but maintains that it was reasonable under the Sixth Amendment for the same reasons that it was permissible under the Speedy Trial Act. In response to Tannehill's constitutional claim, the district court ruled, in part, that the delay was necessitated by the complexity of the case, combined with the need for the lengthy trial records that were essential to Tannehill's defense.[8]

Tannehill asserts that he was prejudiced by the delay because (1) he became insolvent due to the cost of defending the case, has been unable to obtain any significant work as an appraiser due to

---

[8] The Lubbock trial transcript was not completed until June 1991; and the Midland trial transcript did not become available until September 1992, after Tannehill had filed his pretrial motions on September 4.

- 11 -

adverse publicity, and thus had to rely on appointed counsel; and (2) three material witnesses died following the mistrial.  On the other hand, the district court ruled that Tannehill was not prejudiced but, instead, benefited from his counsel's opportunity to review and use transcripts from the other trials.

We agree; the trial transcript reflects several occasions on which Tannehill's counsel used the transcripts for impeachment or in an attempt to secure favorable evidentiary rulings.  And, Tannehill, who was represented at trial by appointed counsel, has not shown prejudice to his defense as the result of his insolvency. Finally, as the district court also ruled, Tannehill has shown no prejudice from the deaths of the three witnesses, because he has not related the substance of their testimony, or shown how it would have affected his defense.

B.

Tannehill contends that the evidence is insufficient to support his convictions for conspiracy and overvaluation.  Our narrow standard of review for challenges to the sufficiency of the evidence after conviction by a jury is well-established:

> We must affirm if a reasonable trier of fact could have found that the evidence established guilt beyond a reasonable doubt.  We must consider the evidence in the light most favorable to the government, including all reasonable inferences that can be drawn from the evidence.  The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence.

*Bermea*, 30 F.3d at 1551.

1.

For the conspiracy conviction, Tannehill maintains that there was no evidence that any alleged co-conspirator asked him to fabricate or arbitrarily inflate appraisals; or that he was present or overheard discussions about the conspiracy; or that he made statements indicating knowledge or awareness of it; or that he agreed to join it. But, there was ample circumstantial evidence to support the jury's finding that Tannehill knowingly participated in the conspiracy.

A lengthy recitation of the evidence is unnecessary. Our review of the trial transcript reveals numerous examples of circumstantial evidence of guilt, including Tannehill's secretary's testimony that, when she asked him why he did not terminate his relationship with the I-30 clients, he responded that he was "in too deep and I can't get out. I have to unload my condos first". Although Tannehill asserts that the secretary admitted, on cross-examination, that he could have been referring to the large accounts receivable balance owed his firm by the savings and loan association, this is precisely the type of alternative hypothesis of innocence that the evidence need not exclude. The jury was free to reject this explanation.

Other circumstantial evidence of Tannehill's participation in the conspiracy includes, for example, testimony about conversations in which he participated, reflecting his knowledge that sales of completed condominiums in the I-30 area were poor and, thus, that high appraisals were unwarranted; and his admission to another I-30

condominium developer that he had been "forced" by Faulkner to include Formann as a partner in the condominium development in which he had invested. It goes without saying that, although Tannehill presented conflicting evidence, "the jury is the final arbiter of the credibility of witnesses". *Bermea*, 30 F.3d at 1552. There is no basis upon which to overturn its conspiracy verdict.

2.

For his convictions on eight overvaluation counts, Tannehill contends that the evidence was insufficient because there was no evidence that he knew, or should have known, that the appraisals were false. He asserts that the evidence showed that his staff appraiser and co-defendant, Formann, gathered the data and prepared the appraisals; that there was no evidence that he conspired with Formann, or was aware that Formann was preparing false appraisals; and that he performed responsibly as a review appraiser in accordance with then prevailing standards.

To establish a violation of 18 U.S.C. § 1014, the Government was required to prove that Tannehill knowingly made a false statement as to a material fact to a financial institution, for the purpose of influencing the institution's actions. *United States v. Thompson*, 811 F.2d 841, 844 (5th Cir. 1987). There was ample evidence from which a rational juror could have found that Tannehill knew that the appraisals overvalued the property. The appraisals valued the property at 20-30% more than the amount for which it was being sold. There was testimony that the appraised values had to be higher than the sales prices so that the lending

- 14 -

institutions, which loaned only 70-80% of the appraised value of the property, could fund 100% of the costs, thus allowing the investor/developer to pay no money down and often receive "up-front" money at the closings.

Moreover, sales of Tannehill's own condominium units in the area were poor, supporting an inference that he could not have assigned such high appraised values to other property in the area in good faith. Tannehill's assertion that his units were not available for sale until October 1982, and that the appraisals at issue were made either before or shortly thereafter, is unavailing in light of evidence that efforts to pre-sell the units prior to their completion were unsuccessful and evidence that, prior to the dates of the appraisals at issue, Tannehill participated in conversations with other I-30 developers in which they discussed poor sales of completed units.

Although Tannehill asserts that there was no evidence that he was aware of Formann's illegal activities until he fired Formann in February 1983, after he learned that Formann was responsible for forging his signature on an appraisal, which occurred after the appraisals at issue were submitted, the Government introduced expert testimony that the inconsistencies and unexplained adjustments in the appraisals could not be attributed to incompetence or negligence, and that an experienced appraiser should have detected them. In short, the jury chose to reject Tannehill's attempt to place all of the blame on Formann, and its decision to do so is supported by the evidence. Accordingly, we

conclude that there was sufficient evidence for the jury to find that Tannehill knew that the appraisal reports he signed reflected overinflated values.

C.

Tannehill presents two evidentiary issues: use of summary evidence; and use of prior testimony of a deceased witness.

1.

Tannehill contends that the district court erred by permitting the Government to base its case on summary evidence.  First, he claims that charts summarizing the transactions at issue were misleading and inaccurate, and contained information that the Government's expert, on cross-examination, admitted an appraiser should not be expected to know or consider in making an appraisal.

Of course, "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of chart, summary, or calculation".  Fed. R. Evid. 1006.  We review the admission of evidence pursuant to Rule 1006 only for abuse of discretion. *See **United States v. Winn***, 948 F.2d 145, 157 (5th Cir. 1991), *cert. denied*, ___ U.S. ___, 112 S. Ct. 1599 (1992).  The district court did not abuse its discretion in admitting the summary charts, because the requirements of Rule 1006 were satisfied.  The documents summarized in the charts were voluminous, and in-court examination would have been more than inconvenient.[9]  Furthermore, the charts had

_____

[9]    The case agent testified that 28,000 documents (55 lateral five-shelf file cabinets), which would fill about two-thirds of the courtroom, were obtained through grand jury subpoenas.

annotations referencing the documents used to prepare them, and the underlying documents were available to the jury. And, the district court instructed the jury on the proper use of the summary evidence:

> Charts or summaries, and the witness's explanation of them, are not in and of themselves evidence or proof of any facts. If these charts or summaries or the witness's explanation of them do not correctly reflect facts or figures shown by the evidence in the case, you should disregard them.

Our court has held that similar instructions were adequate to neutralize any potential for prejudice arising from the use of such evidence. *See Winn*, 948 F.2d at 157-59 & n.30.

Next, Tannehill asserts that the district court erred by admitting the case agent's summary testimony, based on the charts, contending that it was improper and highly prejudicial because, given the relative brevity of the Government's case, there was no need for summarizing, interpreting, or simplifying the evidence. There was no abuse of discretion. The agent's testimony was helpful to the jury in explaining the charts and the documents he relied upon in preparing them, and Tannehill's counsel engaged in thorough cross-examination regarding the assumptions used in preparing the charts.

In addition, Tannehill maintains that these claimed errors were compounded when the district court allowed the charts in the jury room. But, as stated, there were no errors to compound. In any event, although the charts were not admitted in evidence, a notebook, containing copies of them, was admitted. Accordingly,

the district court did not abuse its discretion in allowing the jury to have access to the charts during its deliberations.

Tannehill contends also that the district court erred by permitting numerous witnesses to read from, and interpret, documents of which they had no personal knowledge, including lay analysis of comparable sales and other information in the appraisals prepared by Formann. He asserts that such evidence was prohibited by Fed. R. Evid. 602, which provides, in pertinent part, that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter". Even assuming that the admission of such testimony was error, Tannehill has not shown that it affected his substantial rights. *See* Fed. R. Evid. 103(a).

2.

Rule 804(b)(1) of the Federal Rules of Evidence allows admission of the prior testimony of a deceased witness if the defendant "had an opportunity and similar motive to develop the testimony by ... cross ... examination". Tannehill contends that the district court erred by admitting the 1989 Lubbock trial testimony of a deceased Government witness, asserting that the testimony does not fall under Rule 804(b)(1), because Tannehill did not have the same motive in his prior cross-examination.

Tannehill maintains that his motive for cross-examining the witness at the Lubbock trial was sufficiently different to preclude admission of the testimony, because he was one of seven defendants at that trial, almost all of the cross-examination of the witness

was conducted by counsel for his co-defendants, and his Lubbock trial strategy was to "disappear into the woodwork and hope for the best".

Needless to say, we review the district court's decision to admit the testimony only for abuse of discretion. *See* **United States v. Amaya**, 533 F.2d 188, 191 (5th Cir. 1976), *cert. denied*, 429 U.S. 1101 (1977). Tannehill's motive for cross-examination was not sufficiently different to preclude admission of the testimony under Rule 804(b)(1) merely because different counsel with different defense theories conducted the cross-examination at the Lubbock trial. *See* **id**. at 191-92 (Rule 804(b)(1) does not "condition the use of prior testimony on representation by the same counsel at both trials. Adequate opportunity for cross-examination by competent counsel is sufficient."); Fed. R. Evid. 804(b)(1), advisory committee's note ("If the party against whom [the testimony is] now offered is the one against whom the testimony was offered previously, no unfairness is apparent in requiring him to accept his own prior conduct of cross-examination or decision not to cross-examine."). Although Tannehill's 1993 trial strategy may have changed because he was being tried alone, his motive for cross-examination was the same as in the Lubbock trial: to discredit the witness and separate himself from the other members of the conspiracy. Accordingly, the district court did not abuse its discretion by admitting the testimony.[10]

---

[10]    Prior to trial, the Government moved for admission of the deceased witness' Lubbock testimony; Tannehill opposed the motion, on the same grounds he urges on appeal. After the jury was

- 19 -

Finally, Tannehill bases error on the district court's refusal to give his requested reliance on the advice of counsel jury instruction. Such refusal is reviewed only for abuse of discretion. *E.g.*, **United States v. Sellers**, 926 F.2d 410, 414 (5th Cir. 1991). A district court may refuse "to give a requested instruction which incorrectly states the law, is without foundation in the evidence, or is stated elsewhere in the instructions." **United States v. Neal**, 951 F.2d 630, 633 (5th Cir. 1992). "The refusal to give a requested jury charge is reversible error only if the instruction was substantially correct, was not substantially covered in the charge delivered to the jury, and it concerned an important issue so that failure to give it seriously impaired defendant's ability to present a given defense." **Id**.

Tannehill introduced evidence that one of his attorneys attended a meeting in 1983 regarding the sale of Tannehill's completed condominiums. He asserts that his attorneys reviewed the documents for that transaction, concluded that full disclosure had

---

selected, the district court heard argument on the motion, and granted it the next day. When the testimony was introduced, there was a bench conference; however, it was not transcribed, so the record does not reflect that Tannehill made a contemporaneous objection to the admission of the testimony. Accordingly, pursuant to **United States v. Graves**, 5 F.3d 1546, 1551-53 (5th Cir. 1993) (applying plain error review where defendant did not make contemporaneous objection to admission of evidence that was subject of pretrial ruling on motion *in limine*), *cert. denied*, ___ U.S. ___, 114 S. Ct. 1829 (1994), it is arguable that this issue should be reviewed only for plain error. The Government does not raise this point; and, because we find no error under our normal abuse of discretion standard of review, we need not address it. Counsel are cautioned, however, of the requirement for contemporaneous objections even when admissibility has been decided previously.

been made to the lender, and instructed him to proceed. Although Tannehill was acquitted on the substantive counts relating to that transaction, he points out that it was the subject of two overt acts alleged in the conspiracy count.

The district court did not abuse its discretion. The evidence showed that Tannehill sought the advice of counsel only with respect to the sale of his condominiums, and not with respect to his appraisal activities. Tannehill's assertion that testimony regarding the meeting at which the transaction was structured was the only testimony which even tended to link him to the conspiracy is erroneous; as discussed, there was other evidence of his participation.

In any event, Tannehill's reliance on counsel was adequately covered by the court's instruction that, if the jury found that Tannehill acted with an honest, good faith belief that his statements and actions were legitimate business transactions, that would negate the specific intent required for conviction. Tannehill's acquittal on the substantive counts relating to the only transaction about which he consulted his lawyers tends to show that the refusal of the instruction did not impair seriously his ability to communicate his defense to the jury.

III.

For the foregoing reasons, the judgment is

**AFFIRMED**.