IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 96-20823
_____

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

JAMES HASKELL WILLIAMS,

     Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Texas
_____

January 9, 1998

Before KING and JONES, Circuit Judges, and KENDALL[1], District Judge.

KENDALL, District Judge.

Appellant James Williams appeals his conviction under 8 U.S.C. § 1324(a)(1)(A)(ii) for transporting illegal aliens within the United States. A jury convicted Williams on five counts of aiding and abetting the knowing transportation of illegal aliens within the United States. Appellant now asserts multiple errors involving the sufficiency of the evidence, admission of certain testimony, denial of his motion for mistrial and the denial of his motion to dismiss. Because this court finds no merit in appellant's arguments, we **AFFIRM** the conviction of appellant.

_____

[1]District Judge of the Northern District of Texas, sitting by designation.

## I. FACTUAL BACKGROUND

James Williams is a retired airline pilot from Brownsville, Texas. On August 10, 1995, Williams landed his single-engine, high-wing Cessna 210 aircraft at RWJ Air Park, a remote airstrip near Houston. Williams was accompanied on his flight by his housekeeper, Rosalinda Saenz, and five illegal aliens. Three of the illegal aliens were Mexican nationals and the remaining two were Dominican Republic nationals.

When he landed his plane, Williams was greeted by Doug Pence, a pilot for the United States Custom Service in Houston, Texas. Pence had received a telephone call at the Houston Air Branch explaining that a Customs aircraft was tracking a suspect aircraft heading towards Houston from the Rio Grande area. Pence was requested to participate in the tracking.

Pence gained visual sight of Williams' aircraft over Galveston Bay. He continued to monitor the airplane until it landed at RWJ. Pence met Williams as the two exited their planes and questioned Williams regarding his passengers. Williams explained that he knew Saenz but failed to identify the remaining passengers.

Saenz and the five remaining passengers were required to exit the aircraft and present identification. Saenz produced a Texas identification card. Pence received only Mexican voter registration cards and what appeared to be a pair of Dominican Republic identification or voter registration cards from the other passengers. Saenz and the five aliens were taken into custody at RWJ.

At trial, Williams testified that he sometimes carries paying passengers to supplement his income. Williams explained that on August 9, 1995, he received a telephone call from an unidentified Spanish-speaking female concerning a trip to Houston. Williams could not understand the woman, so he handed the telephone to Saenz. With Saenz translating, Williams agreed to transport four unidentified people to Houston the next afternoon for a price of $175. Williams testified he instructed Saenz to ask if "the people are documented." Saenz informed him that she had been told that they were. Saenz accepted Williams invitation to accompany him to

2

Houston.

Saenz and Williams drove to the airport together the next day. Williams readied his plane for the trip and went to the airport office to pay for his fuel. When he returned, Saenz and five passengers were seated inside the plane. Williams testified that he was in a hurry to take off because of bad weather. As they were taking off, Williams asked Saenz if the aliens had papers. Saenz replied that they did. Williams stated that he then turned to the passengers and said the word "papeles," which he described was about all the Spanish he knew. According to Williams, one passenger showed him a card which Williams thought bore the words "resident alien," and the other passengers showed him similar identification cards with pictures.

Four of the five illegal aliens testified at trial and told essentially the same story. A "coyote" transported them across the Rio Grande and took them to a house in the United States where they spent the night.[2] The next day the coyote drove Saenz and two of the Mexicans to an airport where Saenz took the aliens to a room and instructed them to wait. The coyote returned to the house and drove the remaining three men to the airport. Saenz later took the men to the airplane and told them where to sit. Neither Saenz nor Williams asked their passengers what their names were or whether they had immigration papers.

One of the aliens, Juan José Villar-Sanchez, testified that before Williams left the plane after landing at RWJ, Williams and Saenz had a conversation in English which Villar could not understand. Saenz then spoke to them in Spanish and told them to pretend to be asleep. All the aliens testified that Williams returned to the plane after talking to Pence and spoke to Saenz in English. Saenz immediately instructed the men that, if questioned, they should say that Saenz and Williams did not know that they were illegal aliens.

William Faries runs a small aircraft repair and sales business at the RWJ airport. He testified at trial that as a rule Saenz accompanied Williams on trips when he carried other

_____

[2]A "coyote" is a person who guides illegal aliens across the Mexican border to the United States.

3

passengers. Faries testified that several times Williams had landed at RWJ carrying Saenz and five other passengers. The passengers often would remain in the airplane during stops. Faries stated that on the occasions when Williams' airplane was overloaded, his passengers appeared to be Hispanic.

Faries further testified that a car containing two or three Hispanic persons would sometimes park near the airport for as long as two hours before Williams arrived. When Williams landed, the car would drive very close to his airplane. The passengers would transfer from the plane to the car, which would drive away quickly. On other occasions, Hispanic male passengers would wait in Williams' airplane for as long as two hours while Williams and Saenz ate and relaxed inside the airport.

## II. DISCUSSION

Williams moved for judgment of acquittal at the end of the government's case-in-chief and again at the close of the evidence. Williams asserts that the district court erroneously denied his motion for judgment of acquittal because no evidence, or, alternatively, insufficient evidence, existed to establish that Williams actually knew that the aliens he was transporting were illegally in the United States.

To establish a violation of 8 U.S.C. § 1324(a), the Government must prove (1) that the defendant transported or moved an alien within the United States, (2) that the alien was present in violation of law, (3) that the defendant was aware of the alien's status, and (4) that the defendant acted wilfully in furtherance of the alien's violation of the law. United States v. Diaz, 936 F.2d 786, 788 (5th Cir. 1991). The defendant's knowledge of the alien's illegal status is an essential element of the offense. Id.

The standard for evaluating the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the government, a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. United States v. Bell, 678 F.2d 547, 549 (5th Cir. 1982) (en banc), aff'd, 462 U.S. 356 (1983). This court reviews direct and

4

circumstantial evidence adduced at trial, as well as all inferences reasonably drawn from it, in the light most favorable to the verdict. United States v. Sanchez, 961 F.2d 1169, 1173 (5th Cir. 1992). The jury is solely responsible for determining the weight and credibility of the evidence. United States v. Martinez, 975 F.2d 159, 161 (5th Cir. 1992). The court will not substitute its own credibility determination for that of the jury. Id. The court looks to whether the trier of fact made a rational decision, rather than whether it correctly determined the defendant's guilt or innocence. United States v. Jaramillo, 42 F.3d 920, 923 (5th Cir.), cert. denied, 115 S.Ct. 2014 (1995).

The testimony of the aliens and the fact the identification cards described by Williams were never found was sufficient evidence for a rational jury to have rejected Williams' explanation as not credible and to have concluded that he knowingly transported illegal aliens in violation of § 1324. See Sanchez, 961 F.2d at 1173; Martinez, 975 F.2d at 161, Diaz, 936 F.2d at 788. It is the jury's responsibility to weigh the credibility of witnesses. That the jury chose not to believe Williams' testimony is to Williams' detriment. However, this court will not assume the jury's role on appeal.

Appellant next argues that the district court erred by allowing Faries to testify that Williams and Saenz had flown into RWJ Airport with Hispanic passengers on prior occasions. At trial, Williams objected to this testimony on the basis of relevance. On appeal, Williams now asserts that Faries' testimony regarding Williams' previous flights to RWJ should have been excluded under 404(b). Because Williams failed to assert his 404(b) objection at trial, we will review this objection for plain error. Fed. R. Evid. 103(d). Reversal for plain error is appropriate only in extreme circumstances where a miscarriage of justice otherwise would occur. Wilson v. Waggener, 837 F.2d 220, 222 (5th Cir. 1988). Rule 404(b) prohibits the use of prior bad acts as proof of the defendant's character. Fed. R. Evid. 404(b). Prior bad acts or wrongs are admissible for other purposes such as proof of knowledge or absence of mistake or accident. Id. Even with a Rule 404(b) objection, Faries' testimony could have been admitted to prove evidence

5

of Williams' knowledge that the individuals he was transporting in his airplane were illegal aliens, a fact Williams vehemently denied. Such testimony also could have been admitted to prove that Williams' act of transporting illegal aliens was more than a mere mistake or accident. Thus, we find that the district court's admission of Faries' testimony clearly was not plain error.

This court will review Williams' remaining relevancy arguments under Fed. R. Evid. 403. We review the trial judge's evidentiary rulings for an abuse of discretion. United States v. Fortenberry, 919 F.2d 923, 925 (5th Cir. 1990). Relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Id. This court will not disturb the district court's determination that evidence is relevant "absent a substantial abuse of discretion." Id. Although relevant evidence is inherently prejudicial, the exclusion of such evidence under Rule 403 is allowed only when it is *unfair* prejudice, *substantially* outweighing probative value. United States v. Pace, 10 F.3d 1106, 1115-16 (5th Cir. 1993) (emphasis added).

Faries' testimony regarding Williams' previous trips to RWJ was relevant to and highly probative of the issue of Williams' knowledge of the aliens' status, an essential element of the government's case-in-chief. Evidence of numerous trips to RWJ with an airplane full to capacity with Hispanic passengers is probative and not unfairly prejudicial. This is especially so when viewed against the backdrop of the methods by which they de-planed and their staying on board during two hour "layovers." Williams attempted to rebut Faries' testimony by testifying that he often flew a Hispanic friend and his family into RWJ airport. Williams also stated that he flew into RWJ airport with his Hispanic girlfriend. The jury was capable of determining the weight and credibility to give this conflicting testimony. As we previously stated, this court will not supplant the decision of the jury. We find the trial judge did not abuse his discretion or commit plain error in admitting Faries' testimony, in the face of either a relevancy objection at trial or a Fed. R. Evid. 404(b) complaint for the first time on appeal.

Williams also argues that the district court should not have admitted evidence of Saenz's

prior arrests by the INS. The district court allowed Bill Burkland, a special agent with the United States Immigration Service, to testify that Saenz was arrested the night of August 10, 1995 because Saenz stated that she had two prior experiences with law enforcement, and Burkland wanted an opportunity to find out the details surrounding those incidences. This testimony was allowed after defense counsel suggested on cross-examination that Saenz was arrested because she was Hispanic. The court immediately instructed the jury "that as to this last bit of testimony that the only purpose I'm admitting it is as to the reason why Ms. Saenz was detained and arrested that evening in contrast as to why Mr. Williams was let go that evening without being detained. It's not to be considered as to Mr. Williams." The trial court did not allow testimony regarding the details of those two experiences. Williams urges that Burkland's testimony was highly prejudicial to him. We are unmoved. Moreover, any prejudice to Williams that may have arisen from this testimony was cured by the limiting instruction to the jury.

Williams contends that the trial court erroneously denied his motion for mistrial because the Government was tardy in disclosing evidence which allegedly contradicted Villar's testimony that, while the passengers were being question by law enforcement agents, Saenz slipped Villar $500 when she handed him a Coca Cola can. The evidence in question consisted of the investigative notes of special agent Ismael Valentin, which reflected that Luiz Alberto Rosario Prado, the one alien who did not testify at trial, stated to Valentin during questioning that he had received $500 and a Coke. Williams argues that the evidence should have been disclosed prior to trial under Brady v. Maryland, 373 U.S. 83, 87 (1963).

This court will reverse a district court's refusal to grant a mistrial only for an abuse of discretion." United States v. Limones, 8 F.3d 1004, 1007 (5th Cir. 1993). To establish a Brady violation, the defendant must show that the prosecution suppressed material evidence favorable to the accused. United States v. Neal, 27 F.3d 1035, 1050 (5th Cir. 1994). Because the government produced the allegedly inconsistent statement during the trial, the evidence was not suppressed. Neal, 27 F.3d at 1050; United States v. McKinney, 758 F.2d 1036, 1049-50 (5th Cir. 1985).

7

Under these circumstances, the court looks to whether Williams was prejudiced by the tardy disclosure. Neal, 27 F.3d at 1050.

The trial court denied William's motion for a mistrial, but it offered to grant a continuance so that the defense could review its strategy and examine additional witnesses in connection with the newly disclosed evidence. Because Williams elected to proceed with the trial without taking advantage of the court's offer, he has waived any prejudice caused by the tardily disclosed information. The trial court did not abuse its discretion by denying a mistrial. Neal, 27 F.3d at 1050; Limones, 8 F.3d at 1007.

Next, Williams complains that the trial court erred by denying his motion to dismiss the indictment on grounds of double jeopardy because of the prior forfeiture of his aircraft under 8 U.S.C. § 1324(b). Williams acknowledges that the Supreme Court has determined that civil in rem forfeitures pursuant to 21 U.S.C. § 881(d) and 18 U.S.C. § 981(d) do not constitute punishment within the meaning of the Double Jeopardy Clause,[3] but he urges the court to find that the forfeiture provisions of § 1324(b) are punitive.

To determine whether a forfeiture proceeding is punitive for double jeopardy purposes, the court looks to whether Congress intended the forfeiture proceeding to be civil or criminal and to whether the forfeiture proceedings are in fact so punitive that they "may not legitimately be viewed as civil in nature, despite Congress' intent." Ursery, 116 S.Ct. at 2147 (internal quotation and citation omitted). The forfeiture provisions of § 1324(b) are analogous to the provisions contained in §§ 881(d) and 981(d), which the Supreme Court determined not to be punitive. Like §§ 881(d) and 981(d), § 1324 provides for proceedings in rem; incorporates the procedural mechanisms for forfeitures contained in the customs laws; provides that, once the government has shown probable cause for the seizure, the burden of proof lies with the claimant; and serves the nonpunitive goal of forfeiting only property used to commit a federal violation.[4] Because we are

---

[3]United States v. Ursery, 116 S.Ct. 2135, 2147-49 (1996).

[4]Compare 8 U.S.C. § 1324(b) with 21 U.S.C. § 881(d) and 18 U.S.C. § 981(d).

unpersuaded that § 1324(b) is punitive, Williams' double jeopardy argument necessarily fails.

Finally, Williams argues that the district court erred by refusing to give Williams' requested jury instruction requiring the jury to find specific knowledge on the part of Williams to convict him. Williams contends that the instruction given by the district court did not require proof beyond a reasonable doubt that he was aware that the aliens were illegally in the United States and that he intended to transport them in furtherance of their illegal presence.

This court reviews the district court's refusal to give a requested jury instruction for abuse of discretion. United States v. Branch, 91 F.3d 699, 711 (5th Cir. 1996), cert. denied, 117 S.Ct. 1466, 1467 (1997). This court may reverse only if the requested instruction is substantially correct; was not substantially covered in the charge as a whole; and if the omission of the requested instruction "seriously impaired the defendant's ability to present a given defense." United States v. Tannehill, 49 F.3d 1049, 1057-58 (5th Cir.) (quotations and citation omitted), cert. denied, 116 S.Ct. 167 (1995). The district court is given substantial latitude in formulating the jury charge. United States v. Pettigrew, 77 F.3d 1500, 1510 (5th Cir. 1996).

Williams requested that the jury be instructed: "In order to convict the defendant under this section, the government must prove as to each count beyond a reasonable doubt that the defendant actually knew the alien in question was in the United States in violation of law and that the defendant intended to act in furtherance of the alien's unlawful presence in the United States."

The charge given by the district court stated:

> Title 8, United States Code, Section 1324(a)(1)(A)(ii), makes it a crime for anyone to transport an alien, knowing that the alien is here illegally, and in furtherance of the alien's violation of law.
>
> For you to find any of the defendants guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:
>
> First: That the defendant transported an alien within the United States with the intent to further the alien's unlawful presence;
>
> Second: That the alien had entered or remained in the United States in violation of law; and

9

<u>Third</u>: That the defendant knew the alien was in the United States in violation of law.

. . .

In order for transportation to be in furtherance of an alien's unlawful presence, there must be a direct and substantial relationship between the defendant's act of transportation and its furtherance of the alien's presence in the United States.  In other words, the act of transportation must not be merely incidental to a furtherance of the alien's violation of the law.

The charge given by the district court is substantially the same as both the 1997 Fifth Circuit Pattern Jury Instruction 2.03 and as that requested by Williams.  Williams has not identified any element missing from the charge which impaired his ability to present a defense.  Thus, he has failed to show that the district court abused its discretion by refusing to charge the jury as he requested.  <u>Branch</u>, 91 F.3d at 711; <u>Tannehill</u>, 49 F.3d at 1057-58.

Accordingly, we **AFFIRM** the conviction of appellant.